Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 7, 2003    Decided April 22, 2003

No. 02-5080

UAW–Labor Employment and Training
Corporation, et al.,
Appellees

v.

Elaine Chao, Secretary of Labor, et al.,
Appellants

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00950)

———

*Gregory G. Katsas*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Roscoe C. Howard, Jr.*, U.S. Attorney, *Mark B. Stern* and *Sharon Swingle*, Attorneys, U.S. Department of Justice.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Robert M. Weinberg* argued the cause for appellees. With him on the brief were *Leon Dayan*, *Laurence Gold* and *Melvin S. Schwarzwald*. *Robert Alexander* entered an appearance.

*W. James Young* was on the brief for *amicus curiae* National Right to Work Legal Defense & Education Foundation, Inc. in support of appellants. With him on the brief was *Glenn M. Taubman*.

Before: RANDOLPH and ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Dissenting opinion filed by *Circuit Judge* ROGERS.

WILLIAMS, *Senior Circuit Judge*: On February 17, 2001, relying on his power under the Procurement Act, President Bush issued Executive Order 13201, applying to all government contracts involving more than $100,000. Executive Order 13201, § 2, 66 Fed. Reg. 11,221, 11,221 (2001); 41 U.S.C. § 403(11) (2000). Under the order, each such contract must include a provision requiring contractors to post notices at all of their facilities informing employees of what are commonly known as *General Motors* and *Beck* rights. See Executive Order 13201, § 2, 66 Fed. Reg. at 11,221–22 (2001). (In addition, contractors must require subcontractors to post such a notice. *Id.*) These are rights under federal labor law that protect employees from being forced to join a union or to pay mandatory dues for costs unrelated to representational activities. See *Communications Workers v. Beck*, 487 U.S. 735, 754–63 (1988); see also *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 739–45 (1963). Besides informing employees of their *Beck* rights, the notice is to tell them how they may contact the National Labor Relations Board ("NLRB") for additional information. 66 Fed. Reg. at 11,222.

Plaintiffs brought suit against the Secretary of Labor and the members of the Federal Acquisition Regulatory Council, seeking declaratory and injunctive relief. The plaintiffs are the UAW–Labor Employment and Training Corp. ("UAW")

and three unions. UAW is a non-profit organization that provides job training and placement services; it is a federal contractor subject to the executive order. Accordingly it clearly has standing, and we need not consider whether the other plaintiffs do. See *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

The plaintiffs claimed that the order was preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., and also that, for want of an adequate nexus to the government's interest in efficient and economical contracting, the President had no authority to issue it under the Federal Property and Administrative Services Act of 1949 (the "Procurement Act"), 40 U.S.C. § 471 et seq. (now codified as amended at 40 U.S.C. § 101 et seq.). The district court found preemption, granted declaratory relief, and issued a permanent injunction barring enforcement of the order. It didn't reach the Procurement Act question, but the plaintiffs raise it here as an alternative ground for affirmance. Finding both of plaintiffs' theories to be flawed, we reverse and remand for the district court to grant summary judgment in favor of the government.

As the issues relate solely to summary judgment, we review de novo. See *Indep. Bankers Ass'n v. Farm Credit Admin.*, 164 F.3d 661, 666 (D.C. Cir. 1999).

\* \* \*

Federal labor law preemption falls into two categories, *Garmon* and *Machinists* preemption, named after the cases authoritatively articulating the theories—*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), and *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976). *Garmon* preemption applies to regulation (usually by states) of activities that are arguably "protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *Garmon*, 359 U.S. at 244. *Machinists* preemption applies when a state attempts to regulate an activity that, although not necessarily protected or prohibited

by the NLRA, is an "economic weapon" the exercise of which Congress intended to leave unrestricted. *Machinists*, 427 U.S. at 141. No claim is made that the posting of employees' *Beck* rights represents an economic weapon—certainly not one covered by *Machinists* preemption. Rather the plaintiffs argue and the district court found that the executive order is preempted under *Garmon*.

We first consider the government's suggestion that our preemption analysis should be less intrusive because the order only imposes a contract condition, and firms can choose to do business elsewhere. But at least in labor law, preemption applies to rules of the federal executive even when the government is acting as a purchaser of goods, as long as the government action is classified as regulatory rather than proprietary. See *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1334, 1336–37 (D.C. Cir. 1996); *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 34 (D.C. Cir. 2002). A clause is likely to be found regulatory where it apparently "seeks to set a broad policy." *Chamber of Commerce*, 74 F.3d at 1337. Here, the government doesn't explicitly argue that its actions are proprietary, but notes occasionally that it is only inserting conditions into a contract that businesses voluntarily accept. But as the order operates on government procurement across the board, rather than being tailored to any particular setting, the order is regulatory under prevailing principles. See *id.* at 1336–37.

As we've said, *Garmon* preempts state (or here, federal executive) regulation of "activities [that] are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *Garmon*, 359 U.S. at 244. The district court misconceived this doctrine. It said that under *Garmon* "[t]he question is not whether the NLRA prohibits employers from posting *Beck/General Motors* notices . . . but whether the NLRA prohibits *requiring* employers to post the notices." District Court Opinion at 14. The NLRB had ruled in *Rochester Manufacturing Co.*, 323 N.L.R.B. 260 (1997), that it was not an unfair labor practice for an employer to say nothing to employees about their *Beck* rights, *id.* at 262, and the district court read *Rochester Manufacturing* as

meeting its (misformulated) test. But the question under *Garmon* is whether the "*activities*" are protected or prohibited. 359 U.S. at 244; see also *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986) ("States may not regulate *activity* that the NLRA protects, prohibits, or arguably protects or prohibits.") (emphasis added). Under the district court's approach every activity deemed by the Board *not* to be an unfair labor practice would be preempted, even though the Board had said no more than that the NLRA didn't speak to the matter at all.

The dissent makes a similar error when it suggests that the order is preempted because it conflicts with the "regulatory scheme" the Board has established. See Dissent at 3. This would be a sound analysis under "field" preemption, *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (1985), but *Garmon* works differently, operating only as to activities arguably protected or prohibited, *not* to ones simply left alone, even if left alone deliberately.

In the passage from *Gould* quoted above, the Court said (as indeed it had in *Garmon*, 359 U.S. at 245) that *Garmon* preemption applies even to activities that are only "arguably" protected or prohibited by the NLRA. Plaintiffs note that in *Rochester Manufacturing* the General Counsel in fact argued that not posting of *Beck* rights was an unfair labor practice. Assuming that a ruling accepting the General Counsel's position would survive deferential judicial review, it must follow, they say, that non-posting is "arguably" prohibited. (They make no claim that *posting* is arguably an unfair practice.) But *International Longshoremen's Association v. Davis*, 476 U.S. 380, 394–98 (1986), indicates that the Board's *actual decision* controls; even if "there is an arguable case for preemption," the court "must defer to the Board, and only if the Board decides that the conduct is not protected or prohibited," is the regulation preemption-free. *Id*. at 397. See also *id*. at 395 (saying that the party claiming pre-emption must "advance an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts *or the Board*") (emphasis added); *Hanna Mining Co. v. Dist. 2, Marine Eng'rs Beneficial*

*Ass'n*, 382 U.S. 181, 190 (1965) ("We hold that the Board's statement [that the engineers were supervisors and thus not subject to the NLRA] *does resolve* the question with the clarity necessary to avoid preemption.") (emphasis added). Here the Board has decided that the activity is not prohibited. Of course a consequence may be that a reversal of position by the Board (if permissible) will entail a reversal of this outcome on preemption, but that is a consequence plainly contemplated in the Court's conclusion in *Davis* that a Board decision can resolve what is "arguable" for *Garmon* purposes. As a result, there is little basis for the dissent's concern that the Executive Order "would shift these decisions away from the Board." See Dissent at 2.

*Garmon* preempts not only regulation of activities arguably prohibited by the NLRA, but also regulation of ones arguably protected. Plaintiffs and our dissenting colleague argue that precisely such an activity is in question here—the employer's right to speak, protected by § 8(c) of the Act:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). We consider this speech argument only in the context of preemption; plaintiff raises no free-standing First Amendment claim.

Of course *Garmon*'s own expression of its scope limits its preemption to activities that are arguably "protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." 359 U.S. at 244. Fitting a *Garmon* claim under the language of § 8(c) is awkward. That provision is expressly aimed at a special problem—the risk that a party's advocacy ("views, argument, or opinion") might be burdened (considered "evidence of an unfair labor practice") even though it contained "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Thus § 8(c) works to *negate* an unfair labor practice claim against an

employer posting a notice. But that gives it only a peripheral link to the subject of *Garmon*. Even if we delete *Garmon*'s references to specific sections, the activities described in § 8(c) do not "constitute an unfair labor practice," except by negation, and are not "protected *by*" the NLRA, except from the NLRA itself.

Nonetheless, because the Supreme Court has rather ambiguously invoked § 8(c) in determining whether state libel laws were subject to *Garmon* preemption (and finding that they were in some circumstances), *Linn v. United Plant Guard Workers*, 383 U.S. 53, 58 n.3, 62–63 (1966),[1] we simply assume arguendo that § 8(c) rights could be a basis for preemption.

Section 8(c) "implements the First Amendment" in the labor relations area. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). And the First Amendment includes not only the right to speak, but also the right not to speak. See *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796–97 (1988). But this is as far as plaintiffs' arguments can take them; even assuming that the § 8(c) right includes the right not to speak, an employer's right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks. See, e.g., *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–16 (2d Cir. 2001) (hazard labeling law); *Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 89 (5th Cir. 1975) (posting of OSHA notice). Thus the dissent understandably offers no argument that employers' silence as to *Beck* rights is in fact protected (or even arguably protected). Its suggestion that the Board somehow acknowledged or created such a right in *Rochester*, see Dissent at 2, is perplexing, as the Board found only that it was not an unfair labor practice for the employer to not post the rights, see *Rochester*, 323 N.L.R.B. at 262, not that there was a right to silence or any § 8(c) protection. Thus the

---

[1]  The Court's opinion is unclear whether *Garmon* preemption applied because the speech in question was an activity arguably *prohibited* by the NLRA, so that § 8(c) simply limited the scope of, but was not a source of, preemption; *or* whether the speech in question was arguably "*protected*" by the NLRA.

plaintiffs have pointed to no specific right covered by the order that is "arguably protected by the NLRA."

Finally, both the district court and the plaintiffs invoke language from our decision in *Chamber of Commerce*. There we struck down an executive order barring employers who contracted with the government from hiring permanent replacements, finding it preempted under *Machinists* because hiring permanent replacements was among the "economic weapons" that Congress intended the NLRA would leave in the hands of unions or management, as the case might be. 74 F.3d at 1334. In fact, *Machinists* mentioned hiring of permanent replacements as just such a weapon. 427 U.S. at 153. Here of course no one suggests that *Machinists* applies at all. In a paragraph at the end of *Chamber of Commerce*, however, the court said that "it appear[ed]" that the regulations also ran afoul of *Garmon*. 74 F.3d at 1338–39. We explained that the regulations would produce "a direct conflict with the NLRA," namely, by requiring some employers to bargain with a labor union that had lost majority support. *Id.* No such conflict exists here, so that aspect of *Chamber of Commerce* has no application.

Plaintiffs also point to a footnote in *Chamber of Commerce*, where we said:

> We are also dubious that President Bush's Executive Order 12,800, which required government contractors to post notices informing their employees that they could not be required to join or remain a member of a union, was legal. It may well have run afoul of *Garmon* preemption which reserves to NLRB jurisdiction *arguably* protected or prohibited conduct.

74 F.3d at 1337 n.10 (emphasis added). This of course refers to the *Beck* order issued by the first President Bush, which no one claims is materially different (for present purposes) from that of the current President. But we decided *Chamber of Commerce* before *Rochester Manufacturing*, where the Board rejected the claim that an employer committed an unfair labor practice by failing to post a *Beck* notice. 323 N.L.R.B. at 262. Until *Rochester Manufacturing*, therefore,

under the framework set by *Davis*, that position was "arguable" and thus likely subject to *Garmon* preemption. We also note that the footnote is attached to an extensive discussion about whether the disputed executive order was regulatory or proprietary, and thus appears mainly to suggest that the court would also have classified the *Beck* order as regulatory; we agree.

\* \* \*

As an alternative ground for affirmance the plaintiffs argue that the order is not within the President's authority under the Procurement Act. That act authorizes him to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act." 40 U.S.C. § 486(a) (2000) (now codified as amended at 40 U.S.C. § 121). In *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979), we read this as requiring that the executive order have a "sufficiently close nexus" to the values of providing the government an " 'economical and efficient system for . . . procurement and supply.' " *Id.* at 792, 788 (quoting 40 U.S.C. § 471 (now codified as amended at 40 U.S.C. § 101)). We emphasized the necessary flexibility and "broad-ranging authority" that we understood the Act to give the President. *Id.* at 789. And in fact we found the nexus test satisfied. Although the order required the government to prefer a high bid to a low one, where the low bidder was not in compliance with the government's price and wage guidelines, we accepted the proposition that the order would induce companies to comply, thereby slowing inflation, so that "the Government will face lower costs in the future." 618 F.2d at 792–93.

Here the executive order sought to connect its requirements to economy and efficiency as follows:

> When workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facili-

tates the efficient and economical completion of its procurement contracts.

Executive Order 13201, § 1(a), 66 Fed. Reg. at 11,221. The link may seem attenuated (especially since unions already have a duty to inform employees of these rights), and indeed one can with a straight face advance an argument claiming opposite effects or no effects at all. But in *Kahn*, too, there was a rather obvious case that the order might in fact increase procurement costs (as it plainly did in the short run); under *Kahn*'s lenient standards, there is enough of a nexus.

\* \* \*

We reverse the district court's grant of summary judgment for the plaintiffs. As they asserted only the *Garmon* and Procurement Act claims against the lawfulness of the order, the district court on remand should grant summary judgment in favor of the government.

*Reversed and remanded.*

1

ROGERS, *Circuit Judge*, dissenting: Under Executive Order 13201, a party, and all its subcontractors, contracting with the federal government must provide notice to its employees of their *Beck* and *General Motors* rights[1] or risk debarment. The Executive Order thus would regulate activities regarding union-security clauses, an area where the National Labor Relations Board has primary jurisdiction under the National Labor Relations Act ("NLRA"), and it would do so in a manner that imposes a duty on employers that the NLRA, as interpreted by the Board, does not impose. Consequently, it is preempted under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), and I respectfully dissent.

When the Supreme Court held in *Wisconsin Department of Industry v. Gould*, 475 U.S. 282 (1986), that a state statute debarring repeat NLRA offenders from doing business with the State was preempted by the NLRA, the Court explained that *Garmon* preemption prevents the States from "setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, [and] also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Id.* at 286. Concerned that there not be state standards that would interfere with Congress' "integrated scheme of regulation," the Court rejected the notion that "a supplemental remedy is different in kind from those that may be ordered by the Board" and would do no harm. *Id.* at 287. The focus, the Court explained, was on the activities, not the method of regulation. *Id.*

Union-security clauses and activities related to them fall squarely within the regulatory scope of the NLRA. *See* §§ 7, 8(a)(3), (b)(2), (f), 29 U.S.C. §§ 157, 158(a)(3), (b)(2), (f). The Supreme Court acknowledged that "federal concern is pervasive and its regulation complex" in this area, *Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 296 (1971), and this court observed in *Thomas v. NLRB*, 213 F.3d 651 (D.C. Cir. 2000), that, as a consequence, "[a]ll the details necessary to make

---

[1] *Communication Workers v. Beck*, 487 U.S. 735, 754–63 (1988); *see also NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 739–45 (1963).

the rule of *Beck* operational were left to the Board, subject to the very light review authorized by *Chevron*." *Id.* at 657 (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012, 1016 (7th Cir.), *cert. denied sub nom. Strang v. NLRB*, 525 U.S. 813 (1998)).

Executive Order 13201, by imposing a requirement on employers about what they must say in the context of union-security clauses and establishing remedies for noncompliance, would shift these decisions away from the Board. This runs afoul of *Garmon*'s recognition of Congress' choice of the Board to implement the NLRA. *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 225 (1993); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748–49 & n.26 (1985). The conflict that *Garmon* preemption seeks to avoid is evident by comparing the regulatory scheme envisioned in Executive Order 13201, with its posting requirement on penalty of debarment, and an employer's right under the NLRA, as interpreted by the Board in *Rochester Manufacturing Co.*, 323 N.L.R.B. 260 (1997), to speak or not to speak about *Beck* rights. In rejecting the General Counsel's position that the employer's failure to advise employees of *Beck* rights was an unfair labor practice, the Board in *Rochester Manufacturing* determined that under the NLRA the employer has no duty to inform its employees of their rights under *Beck,* declining to hold that an employer had an "affirmative obligation," comparable to the union's duty of fair representation, "to spell out for employees the precise extent of the union-security obligation." *Rochester Mfg.*, 323 N.L.R.B. at 262. Executive Order 13201, on the other hand, would force employers to surrender one of the speech options left open by the Board in *Rochester Manufacturing* or risk imposition of a draconian penalty, in conflict with the primary jurisdiction of the Board to decide whether an activity is lawful under §§ 7 and 8 of the NLRA, regardless of whether the Board has exercised its jurisdiction. *See Garmon*, 359 U.S. at 245; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1337 n.10 (D.C. Cir. 1996); *see also Washington Serv. Contractors Coalition v. District of Columbia*, 54 F.3d 811, 815–16 (D.C. Cir. 1995). As the

plaintiffs point out, the court has acknowledged the broad scope of preemption under *Garmon*, *see Chamber of Commerce*, 74 F.3d at 1334, and has rejected a crabbed conception of "consistency" and thus any suggestion that the employer's foregoing one of two permissible options under Executive Order 13201 creates no *Garmon* conflict.

The court rejects this approach relying on *International Longshoremen's Association v. Davis*, 476 U.S. 380, 394–98 (1986). Opinion at 5. Because the Board rejected the position that non-posting of *Beck* rights was an unfair labor practice, it follows, the court says, that there is no basis to suggest that non-posting is "arguably" prohibited, for the Board in *Rochester Manufacturing* "has decided that the activity is not prohibited." Opinion at 6. But this is a sleight of hand, for the court's approach ignores the conflict that Executive Order 13201 would create with the regulatory scheme for union-security clauses that the Board has established, namely a scheme in which the employer may or may not inform its employees about *Beck* rights.

In rejecting the plaintiffs' alternative claim that Executive Order 13201 is preempted because it regulates activity protected or arguably protected by § 8(c), the court focuses on the hole in the donut and ignores the donut itself, stating that "[f]itting a *Garmon* claim under the language of § 8(c) is awkward." Opinion at 6. The Supreme Court in construing § 8(c) has adhered to the rationale of *Garmon* preemption, that "[t]o leave the States [and non-Board actors] free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." *Garmon*, 359 U.S. at 244. Thus, in *Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966), the Supreme Court held that a state defamation statute was preempted in labor relations areas except where actual malice is found. *Id.* at 61. The Court explained that "the enactment of § 8(c) manifests a congressional intent to encourage free debate on issues dividing labor and management," and that limiting the applicability of the state statute to cases of actual malice "guard[ed] against abuse of libel actions and unwar-

ranted intrusion upon free discussion envisioned by the Act." *Id.* at 62, 65.

The court finds ambiguity in *Linn*, Opinion at 7 & n.1, notwithstanding the fact that the *Linn* Court was clear that § 8(c) reflected Congress' goal of promoting robust and wide-open debate in the context of labor relations and that the application of state libel laws would interfere with this goal. *See Linn*, 383 U.S. at 62; *see also id.* at 58 n.3. While not expressly stating that *Garmon* preemption applied because § 8(c) protects an employer's free speech rights, this reasoning is implicit in *Linn.* To the extent there may be doubt, the Supreme Court has plainly spoken elsewhere that § 8(c) protects the employer's First Amendment right to express its views about unionism. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–18 (1969). That *Linn* was only partially relying on § 8(c) has not deterred the Supreme Court from applying *Linn* to labor disputes "in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 279 (1974); *see id.* at 271–73, 276–79. In sum, the hole – arising from the fact that the language of § 8(c) protects employers's speech rights from the NLRA, *see* Opinion at 6–7 – does not eviscerate the donut, which consists of the broad protection of employer speech under § 8(c), as is reflected in the Board's determination that as to *Beck* rights the employer has no duty under the NLRA to speak or not to speak.

Assuming protection of employer speech rights under § 8(c), the court concludes that Executive Order 13201's posting requirement is not unlike other federal posting requirements imposed on employers. Opinion at 7 (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–16 (2d Cir. 2001); *Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 89 (5th Cir. 1975)). The plaintiffs do not claim that the employer's speech rights under § 8(c) are absolute; to the contrary. Appellees' Br. at 29. But Executive Order 13201 is different from the posting requirements cited by the court. Unlike cases not within the regulatory authority of the Board where impositions on the employer's speech rights have been

upheld, Opinion at 7, the courts have recognized that the implementation of *Beck* and *General Motor* rights is a matter "left to the Board." *See Thomas*, 213 F.3d at 657. The Board in *Rochester Manufacturing* preserved the employer's right under the NLRA to speak or not to speak on this issue. Like the state defamation law preempted in *Linn*, Executive Order 13201 would punish speech rights that Congress has protected under the NLRA, as interpreted by the Board, and thus would create unacceptable conflict with the Board's primary responsibility for activities relating to union-security clauses. Accordingly, I respectfully dissent.