RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHIGAN BUILDING AND CONSTRUCTION
TRADES COUNCIL and GENESEE, LAPEER,
SHIAWASSEE BUILDING AND CONSTRUCTION
TRADES COUNCIL, AFL-CIO,
          *Plaintiffs-Appellees*,

      v.

RICHARD SNYDER, Governor of the State of
Michigan, in his official capacity,
          *Defendant-Appellant*.

Nos. 12-1246/2548

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:11-cv-13520; 2:12-cv-13567—Victoria A. Roberts, District Judge.

Argued: June 18, 2013

Decided and Filed: September 6, 2013

Before: SILER, MOORE, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dennis J. Raterink, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. John R. Canzano, McKNIGHT, McCLOW, CANZANO, SMITH & RADTKE, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** Dennis J. Raterink, Susan Przekop-Shaw, Dan V. Artaev, Christopher W. Braverman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. John R. Canzano, McKNIGHT, McCLOW, CANZANO, SMITH & RADTKE, P.C., Southfield, Michigan, Terry R. Yellig, Victoria L. Bor, SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C., Washington, D.C., for Appellees.

ROGERS, J., delivered the opinion of the court, in which SILER, J., joined. MOORE, J. (pp. 14–32), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Project labor agreements are contracts typically used in the construction industry to set common terms and conditions of employment for large projects involving multiple subcontractors and unions.  The question on this appeal is whether the State of Michigan—with respect to the construction of public projects—can make an across-the-board determination not to require that its contractors enter into such agreements.  Such an across-the-board determination could be made by a private developer.  Michigan can do the same because in this respect the state is acting as a market participant rather than as a regulator.

Michigan passed the first version of the Fair and Open Competition in Governmental Construction Act in 2011.  Plaintiffs—state and local trades councils—claimed that the act was preempted by the National Labor Relations Act (NLRA) and asked for an injunction. The district court granted the injunction in February 2012.  That version of the act has been entirely superseded by an amended version of the act, passed in 2012, rendering the Governor's appeal of that injunction moot. The district court subsequently enjoined the current version of the act, finding it preempted by the NLRA.  However, the act furthers Michigan's proprietary goal of improving efficiency in public construction projects, and the act is no broader than is necessary to meet those goals.  Thus, the law is not preempted by the NLRA.

Both versions of the act restrict the use of Project Labor Agreements (PLAs) on publicly funded construction projects.  A PLA sets out the terms and conditions of employment on a specific construction project.  On a public construction project, the PLA can be entered into by the governmental unit paying for the project or by a general contractor the governmental unit hires.  The other party to the PLA is the relevant labor organization.  Once a PLA is in force, every lower-level contractor must abide by it to be able to work on the project.  Thus, if the governmental unit itself enters into a PLA, all contractors bidding on the project must agree to abide by the PLA.  If a general

contractor enters into a PLA, all its subcontractors on that project must agree to abide by the PLA.  The PLAs will often incorporate terms from individual local union collective bargaining agreements, but the PLA will supersede those agreements.

There has been debate over whether PLAs increase the costs of government projects.  Opponents of PLAs argue that PLAs discourage nonunion contractors and subcontractors from bidding on government contracts and that the rules included in PLAs increase construction costs.  The Governor cites reports that found that PLAs add 12–18% to the costs of public projects.[1]  PLA proponents, like the trades councils, counter that PLAs enhance job-site cooperation and reduce labor disputes, thus preventing delays and cost overruns on public projects.  The trades councils cite several reports supporting their position.[2]  The federal government has gone back and forth on whether PLAs should be permissible for federally funded projects.  President George H. W. Bush used an executive order to forbid the use of PLAs on federally funded projects. *See* Exec. Order No. 12,818, 57 Fed. Reg. 48713 (Oct. 23, 1992).  President Clinton rescinded that order and encouraged the use of PLAs on construction projects over $5 million.  *See* Exec. Order No. 12,836, 58 Fed. Reg. 7045 (Feb. 1, 1993).  President George W. Bush reinstated the ban on the use of PLAs on federally funded projects, *see* Exec. Order No. 13,302, 66 Fed. Reg. 11225 (Feb. 17, 2001), only to see President

---

[1] These reports include Vazques, Glaser & Bruvold, *Measuring the Cost of Project Labor Agreements on School Construction in California*, *available at* http://www.nusinstitute.org/assets/resources/pageResources/Measuring-the-Cost-of-Project-Labor-Agreements-on-School-Construction-in-California.pdf (last visited August 08, 2013) (finding that PLA school construction projects cost 13% more per square foot than comparable non-PLA projects); Tuerck, *Why Project Labor Agreements Are Not in the Public Interest*, 30 CATO J. 45 (Winter 2010), *available at* http://www.cato.org/sites/cato.org/files/serials/files/cato-journal/2010/1/cj30n1-3.pdf (last visited August 08, 2013) ("By one estimate, PLAs add 12–18 percent to the cost of public projects"); and Tuerck, Glassman & Bachman, *Project Labor Agreements on Federal Construction Projects: A Costly Solution in Search of a Problem*, *available at* http://www.beaconhill.org/BHIStudies/PLA2009/PLAFinal090923.pdf (last visited August 08, 2013) (noting that PLAs increased construction costs on state school construction projects).

[2] The councils cite, among others, Dale Belman and Matthew M. Bodah, *Building Better: A Look at Best Practices for the Design of Project Labor Agreements* (Economic Policy Institute Briefing Paper #274, Aug. 10, 2010), *available at* http://epi.3cdn net/179fd74170130cd540_ibm6ib3kd.pdf (last visited August 08, 2013) (discussing benefits of PLAs, including quick resolution of labor disputes and improved working conditions); Dale Belman et al., *Project Labor Agreements' Effects on School Construction Costs in Massachusetts*, 49 Indus. Rel. 44 (2010), *available at* https://www.msu.edu/~drdale/Publications/Construction%20&%20PLAs/Project%20Labor%20Agreements'%20Effect%20on%20School%20Construction%20Costs%20IR%20-%20Copy.pdf  (last visited August 08, 2013) (arguing that PLAs do not increase construction costs).

Obama again lift the ban and allow agencies to use PLAs for construction projects that cost the government over $25 million, *see* Exec. Order No. 13,502, 74 Fed. Reg. 6985 (Feb. 6, 2009).

The Michigan legislature stepped into this debate in 2011 by passing S.B. 165, the Fair and Open Competition in Governmental Construction Act, 2011 Mich. Pub. Acts 98.  The introduction to the act stated that its goal was

> to provide for fair and open competition in governmental construction contracts, grants, tax abatements, and tax credits; to prohibit requirements for certain terms in government contracts and contracts supported through government grants and tax subsidies and abatements; to prohibit expenditure of public funds under certain conditions; to prohibit certain terms in procurement documents for certain expenditures involving public facilities; and to provide for powers and duties of certain public officers, employees, and contractors.

*Id.*  The act barred governmental units from entering or expending funds on a project if the contract or any subcontract contained a PLA.  *Id.* § 5.  It also forbade the governmental units from awarding grants, tax abatements, or tax credits while under a PLA, *id.* § 7, and forbade governmental units and their agents from placing any PLA terms in bid specifications, project agreements, or other controlling documents, *id.* § 9.

The Michigan Building and Construction Trades Council, AFL-CIO, and Genesee, Lapeer, Shiawassee Building and Construction Trades Council, AFL-CIO, both associations of labor organizations, filed suit.  The trades councils argued, among other things, that the new law was preempted by the NLRA, which permitted the use of PLAs. The district court agreed and issued a preliminary injunction.  The court rejected the Governor's argument that the state was acting in its proprietary capacity when it passed the law.  The court determined that the law was regulatory and that it was preempted by Sections 7 and 8 of the NLRA.  *Mich. Bldg. and Const. Trades Council, AFL-CIO v. Snyder*, 846 F. Supp. 2d 766, 783 (E.D. Mich. 2012).

The Governor appealed.  While that appeal was pending in this court, the Michigan legislature amended the act.  The legislature clarified that it intended the act

"to provide for more economical, nondiscriminatory, neutral, and efficient procurement of construction-related goods and services by this state and political subdivisions of this state as market participants," and that "providing for fair and open competition best effectuates this intent." 2012 Mich. Pub. Acts 238 § 2 (codified at Mich. Comp. Laws § 408.872). The amended act replaced Section 5, which had previously barred government spending on any project that included a contract or a subcontract that contained a PLA. The new Section 5 only barred governmental units from entering into PLAs themselves. *Id.* § 5 (codified at Mich. Comp. Laws § 408.875). It also forbade governmental units from discriminating against bidders on public projects based on whether the bidder had entered into a PLA. *Id.* The legislature also added a new section to the act stating that the act "does not prohibit a governmental unit from awarding a contract, grant, tax abatement, or tax credit to a private owner, bidder, contractor, or subcontractor who enters into or who is party" to a PLA so long as entering into that PLA "is not a condition for award of the contract, grant, tax abatement, or tax credit. . . ." *Id.* § 8 (codified at Mich. Comp. Laws § 408.878).

These changes satisfied neither the trades councils nor the district court. On the trades councils' request, the district court enjoined the new version of the act as well. Once again, the district court found the act preempted by Sections 7 and 8 of the NLRA because the act still prohibited governmental units from requiring their contractors to adhere to PLAs as a condition of a contract award. The court also found, contrary to the legislature's statement that the state was acting as a market participant, that the act is tantamount to regulation because it is broad in scope and "does not reflect the State's interest in efficient procurement of goods or services." The court noted that if the state were acting as a private proprietor would, it would consider PLAs on a case-by-case basis and would not issue a blanket prohibition. *Mich. Bldg. & Constr. Trades Council v. Snyder*, No. 12-13567, 2012 WL 6155964, at *7 (E.D. Mich. Nov. 15, 2012).

The Governor also appealed the second injunction. Upon the Governor's unopposed request, this court consolidated the two appeals.

The Governor's appeal of the injunction of the original version of the act is now moot. That version has been replaced entirely by the current version, enacted in 2012, and removing the injunction would have no effect. A case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation marks omitted). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). The enactment of the current version of the act is such an event. Therefore, the Governor's appeal of the first injunction must be dismissed.

Both parties argue that the appeal of the original injunction is not moot, but their arguments are unavailing. The Governor argues that the appeal is not moot because the councils make the same preemption arguments with regard to the current version of the act as they did against the first version. However, those arguments are appropriately considered in light of the language of the law as it stands now, not as it was before the amendments. The councils note that a reversal of the first injunction will jeopardize PLAs signed in the period while the original act was enjoined but before the amended act went into effect. However, the Governor has given no indication that the state intends to challenge contracts entered into by governmental units before the enactment of the current version of the act, and no such challenges have been identified. While the original act barred governmental units from entering into or expending funds under contracts that contained PLAs, *see* 2011 Mich. Pub. Acts 98 § 5, the current version only bars governmental units from entering into new PLAs on or after the effective date of the amendatory act, *see* 2012 Mich. Pub. Acts 238 § 5 (codified at Mich. Comp. Laws § 408.875). The Governor has repeatedly contended before this court that, contrary to its apparent language, the original act's exceptions meant that it did not bar governmental units from entering into contracts with contractors or subcontractors that had PLAs. *See* Reply Br. in No. 12-1246 at 5–6. Thus, we take these contentions as a representation that the state will not seek to invalidate contracts that would be legal under the current version of the act on the basis of illegality under the original version.

The parties agree that if the state's statutes are proprietary rather than regulatory, the councils' arguments based on the NLRA fail.  *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993).  The current version of the act is proprietary.  The state is seeking to preserve taxpayer resources by encouraging open competition among potential contractors and subcontractors.  It is not banning PLAs, and contractors who enter into PLAs can compete on equal footing with non-PLA contractors for public contracts.  Private entities, including contractors working on government projects, remain free to enter into PLAs.  The law's effect is limited to forbidding governmental units from entering into PLAs and then forcing the terms and conditions found within on bidders, contractors, and subcontractors.  Such a limited action is similar to those found to be proprietary by the Supreme Court, this court, and other circuits.

The statements of intent within the legislation and its legislative history provide evidence that the legislation was passed in an effort to improve efficiency in government projects, not to regulate.  The act specifically states that it is intended "to provide for more economical, nondiscriminatory, neutral and efficient procurement of construction-related goods and services by this state and political subdivisions."  2012 Mich. Pub. Acts 238 § 2 (codified at Mich. Comp. Laws § 408.872).  The legislative history further demonstrates this intent.  Senator Moolenaar explained that the act is intended to "guarantee[] the equal opportunity and fiscal accountability that taxpayers expect from government."  S. Journal 48, 96th Leg., at 867 (Mich. 2012).  Even the act's opponents believed that the act was intended to save resources, with Senator Gleason arguing that the act constitutes a terrible decision to "go cheap on labor" because it would lead to the use of lesser-skilled workers and shabbily built projects.  He noted that it would be better to have "high standards and high qualifications, not low cost."  *Id.* at 866–67.

The limits of the act demonstrate its proprietary nature.  The act affects only the actions of the state and political subdivisions of the state.  It has no effect on private projects.  Furthermore, even its effect on public projects is limited.  The act forbids governmental units and their agents from entering into PLAs.  It does not forbid the use

of PLAs on public projects. If a governmental unit uses a general contractor on a project, and that general contractor is responsible for all subcontracting, the general contractor could enter into a PLA that would cover the entire project. Under the act, bidding on public construction projects must be open to contractors whether or not they are parties to PLAs, and a governmental unit cannot discriminate in favor of or against a contractor because it is party to a PLA. 2012 Mich. Pub. Acts 238 § 5(b) (codified as Mich. Comp. Laws § 408.875(b)).[3] The councils argue that the act severely restricts the use of PLAs because PLAs are ineffective if they do not apply to every contractor on the project, and some contracts involve more than one general contractor. However, all that a governmental unit needs to do to encourage bids that include effective PLAs is choose to give all subcontracting power to one general contractor. Furthermore, for those projects where a PLA is the most efficient way to proceed, the general contractors are free to come together to enter a PLA.

The councils argue that the act is too broad to be proprietary because it does not consider projects on a case-by-case basis. But private proprietors can and do act on an across-the-board basis without somehow becoming regulators. The legislature permissibly decided that public resources would best be preserved by taking the PLA decision out of the hands of governmental units and leaving it to private contractors.

The trades councils also argue that the statute is too broad because it extends coverage to governmental projects funded by private or federal funds. However, this argument presumes that the state does not have a proprietary interest in the efficiency of construction projects financed by private or federal money. Using such funds efficiently allows for more to be done with limited funding and increases the likelihood that more projects will be funded. This is a proprietary interest that the legislation directly furthers. Moreover, even private developers could reasonably impose such restrictions notwithstanding the presence of outside funding. In contrast, by focusing on

---

[3] During oral argument, counsel for the Governor stated that a governmental unit could not choose a contractor who had a PLA if it had put in the lowest bid for a project. The Governor later clarified that that reading of the law is incorrect. The opposite is true—if a contractor with a PLA submits the lowest bid, it would be a violation of the act for the governmental entity not to choose that contractor because of the existence of the PLA.

state action instead of state funding, the act allows *private* projects receiving state grant funds to use PLAs if those private entities so desire.  *See* 2012 Mich. Pub Acts 238 § 8 (codified at Mich. Comp. Laws § 408.878).  This is a limit President George W. Bush's executive order did not contain, *see* Exec. Order No. 13,302, 66 Fed. Reg. 11225 (Feb. 17, 2001), and it further demonstrates that the statute's goal is efficiency in government construction and not the wholesale elimination of PLAs.

The proprietary nature of the act is directly supported by the Supreme Court's holding in *Building & Construction Trades Council v. Associated Builders & Contractors*, 507 U.S. 218 (1993) (*Boston Harbor*).  In *Boston Harbor*, the Court held that the government-mandated requirement of a PLA for the Boston Harbor construction project was proprietary.  In *Boston Harbor*, the Massachusetts Water Resources Authority enforced a PLA negotiated by its agent and a local trades council in an effort to avoid delays from labor disputes.  A contractors' association complained, arguing that the agreement violated the NLRA.  The Supreme Court held that preemption did not apply because the Authority's action was proprietary.  "When a State owns and manages property," the Court explained, "it must interact with private participants in the marketplace.  In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*."  *Id*. at 227 (emphasis in original).  The Court noted that "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as *purchaser* should be permitted to do the same."  *Id.* at 231 (emphasis in original).

That lesson must be applied to this case.  Just as a private purchaser can choose not to enter into PLAs, believing them to be inefficient, a state legislature, sharing that same belief, can decide that public money should not to be used for PLA projects.  In *Boston Harbor*, the Authority "was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost."  *Id.* at 232.  The Michigan legislature has stated a similar goal.  Although the legislature acted on all projects at once, unlike the Authority in *Boston Harbor*, that is not alone sufficient to make an action regulatory.  While some, such as Senator Gleason, may argue that

banning the use of PLAs actually sacrifices speed and efficiency in favor of cost savings, it is not the job of this court to question whether the legislature made the correct decision. It is a permissible decision.

This type of action is materially different from the challenged action in *Wisconsin Department of Industry v. Gould*, 475 U.S. 282 (1986). In that case, Wisconsin maintained a list of repeat NLRA-violators and forbade state procurement agents from doing business with any person or firm on that list. *Id.* at 283–84. The Court held that the statute requiring this practice was regulatory and preempted by the NLRA, explaining that "on its face the debarment statute serves plainly as a means of enforcing the NLRA. . . . [T]he point of the statute is to deter labor law violations and to reward 'fidelity to the law.'" *Id.* at 287. Unlike in *Boston Harbor*, "[n]o other purpose could credibly be ascribed" to the statute. *Id.* As the Court explained in *Boston Harbor*, the problem with Wisconsin's action in *Gould* was that it constituted "a state agency's attempt to compel conformity with the NLRA." 507 U.S. at 228. The statute "addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and . . . the State's reason for such conduct was to deter NLRA violations." *Id.* at 228–29. Here, the act purportedly conserves state resources. The state did not restrict its choices to promote the enforcement of a different labor policy. This act is closer to the action the Court found proprietary in *Boston Harbor* than to the statute found to be regulatory in *Gould*.[4]

---

[4]*Chamber of Commerce v. Brown*, 554 U.S. 60 (2008), is like *Gould*. The Supreme Court held to be pre-empted a California statute ("AB 1889") prohibiting employers that receive state grants or program funds from using the funds "to assist, promote, or deter union organizing," and establishing a "formidable" scheme to enforce the statute. *Id.* at 63. The Supreme Court reasoned that California had acted in its regulatory capacity not only because the statute was not "specifically tailored to one particular job" but also because the statute was not a "legitimate response to state procurement constraints or to local economic needs," *id.* at 70. citing *Gould*. In particular,

> the legislative purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy. Although a State has a legitimate proprietary interest in ensuring that state funds are spent in accordance with the purposes for which they are appropriated, this is not the objective of AB 1889. In contrast to a neutral affirmative requirement that funds be spent solely for the purposes of the relevant grant or program, AB 1889 imposes a targeted negative restriction on employer speech about unionization. Furthermore, the statute does not even apply this constraint uniformly. Instead of forbidding the use of state funds for *all* employer advocacy regarding unionization, AB 1889 permits use of state funds for *select* employer advocacy activities that promote unions.

This court's precedent demonstrates this dividing line.  In *Petrey v. City of Toledo*, we held that provisions of a city towing ordinance that chose certain tow companies for police towing were proprietary because they "do not constitute attempts on the part of the City to regulate the towing industry as a whole, or to advance some general societal goal."  246 F.3d 548, 558–59 (6th Cir. 2001), *abrogated on other grounds by City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 U.S. 424 (2002).  Instead, the provisions were meant to ensure administrative efficiency and city monitoring.  *Id.* at 558.  Similarly, the Michigan act does not regulate the construction industry as a whole and does not aim to eliminate PLAs altogether.  Instead, it is meant to ensure efficiency and save taxpayer money.

Other circuits' decisions support this analysis. *Building and Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), is directly on point.  *Allbaugh* was a challenge to President George W. Bush's ban on federal agencies' requiring PLAs for federally funded projects. *See* Exec. Order No. 13,302, 66 Fed. Reg. 11225 (Feb. 17, 2001).  The D.C. Circuit considered both *Boston Harbor* and *Gould* and found that the challenged executive order constituted proprietary action.  The D.C. Circuit held the relevant distinction to be whether the government "'acts just as a private contractor would act' . . . or instead seeks to affect conduct 'unrelated to the employer's performance of contractual obligations.'"  295 F.3d at 34–35 (quoting *Boston Harbor*, 507 U.S. at 233, 229).  The court noted that "the Government unquestionably is the proprietor of its own funds, and when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity."  *Id.* at 35.  The D.C. Circuit also addressed the same case-by-case vs. blanket-rule argument that the councils make here, and concluded that "there simply is no logical justification for holding that if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as a market participant."  *Id.* (internal quotation marks omitted). "Because the Executive Order does not address the use of PLAs on projects unrelated

*Id.* at 70–71 (citations omitted).  The Michigan statute at issue in this case has nothing like these facially regulatory aspects of AB 1889.

to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as 'regulatory.'" *Id.* at 36. The executive order at issue in *Allbaugh* is almost identical to the Michigan act in its effect on PLAs.

*Allbaugh* is the closest parallel to this case. The councils argue that *Allbaugh* is no longer good law; however, the cases they point to have not criticized *Allbaugh* and each is distinguishable. *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), was a challenge to an executive order requiring contractors who obtain large government contracts to post notices at all facilities informing employees of their rights not to join a union or pay certain union dues. The D.C. Circuit held the order to be regulatory instead of proprietary. The challenged order, like the statute in *Gould* and unlike the authority's action in *Boston Harbor* and the order in *Allbaugh*, had no effect on government resources. Its sole purpose was to use government contracts as a tool to promote a certain labor policy. The government did not even explicitly argue that its actions were proprietary. 325 F.3d at 363. *UAW-Labor* was a straightforward application of *Gould* and does not say anything about the continued validity of *Allbaugh*.

Precedent from other circuits follows this same pattern. The Fifth Circuit, considering *Gould* and *Boston Harbor*, held that a city's grant of an exclusive towing contract to a company was proprietary. *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999). The city's action ensured efficient towing, clarified responsibility, minimized administrative confusion, and allowed for easy supervision. Furthermore, there was no indication that the city's goal was to encourage private towing companies to conduct their business in a specified manner. *Id.* Likewise, the Third Circuit has noted that the "pivotal difference" between *Gould* and *Boston Harbor* "is that in the former case the state deployed its spending authority to achieve a goal far broader than merely protecting or fostering its own investment or proprietary interest, while in the latter instance the public agency limited its spending conditions to the protection of its investment or proprietary interest." *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hospitality Res.*, 390 F.3d 206, 214 (3d Cir. 2004). The Third

Circuit held that an ordinance conditioning tax-incentive funding on an employer's acceptance of a labor neutrality agreement was intended to promote and protect the city's interest in tax revenues from the project and was therefore proprietary. *Id.* at 217. Notably, in reaching that decision, the court considered *Allbaugh* in its survey of other circuits, and did not criticize it.   *Id.* at 215.   Finally, the Seventh Circuit held a Milwaukee ordinance requiring city contractors to reach "labor peace agreements" with unions to be regulatory because the ordinance would have significant spillover effects on private contracts and because the city passed up easy alternatives to achieve the same desired effect without the spillover effects.  *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 431 F.3d 277, 280 (7th Cir. 2005).  These cases all draw a similar line: to be proprietary, the government action must be aimed to achieve a proprietary goal and must be limited to the furtherance of that goal.  The Michigan statute falls on the proprietary side of that line.

Michigan's statute advances the proprietary interest of efficient use of resources and is limited enough to advance only that interest.  Accordingly, it is proprietary, and not regulatory, and therefore is not preempted by the NLRA.

In case No. 12-1246, the appeal is dismissed as moot.  In case No. 12-2548, the district court's judgment is reversed and the injunction is vacated.

————————————

**DISSENT**

————————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The Supreme Court has held that a state cannot regulate activity protected by the National Labor Relations Act ("NLRA"). In 2012, however, the Michigan legislature enacted the amended Fair and Open Competition in Governmental Construction Act ("amended Act"), a statute forbidding all governmental units in Michigan from entering into project labor agreements ("PLAs"), a kind of collective bargaining agreement typically associated with construction projects and expressly protected by the NLRA. This sweeping measure affects every governmental unit in the state, including local government entities, on every contract these units award, even those that are privately funded. By necessary implication, the amended Act also affects all labor organizations or trade councils seeking to enter into a PLA with a government entity. In short, Michigan implemented a statute that regulates collective bargaining.

The majority attempts to escape this conclusion by pointing out that there is a type of action that the amended Act does not regulate—PLAs entered into by private parties. But this is unpersuasive for two key reasons. First, the issue in front of this court is whether the amended Act interferes with an organization's right to convince a governmental unit to enter into a PLA, not whether the amended Act interferes with a private party's right to enter into PLAs independently. Second, the fact that the amended Act does not regulate every PLA does not mean that it is not regulating some PLAs. We have never held that a statute must regulate everything in order to regulate something. Because I believe that we must follow the clear dictates of the Supreme Court that a state does not have the authority to enact broad statutes implementing labor policy in an area protected by the NLRA, I cannot agree with the majority's conclusion. I respectfully dissent.

## I.  STANDARD OF REVIEW

As an initial matter, it is important to note that Snyder appeals from the district court's grant of a preliminary injunction on enforcement of the amended Act, the review of which is governed by specific principles.  The majority not only fails to recognize the posture of this appeal, but also declines to specify the standard under which it conducts its review.  As a result, it is unclear on what basis the majority reverses the order of the district court.  Because we review a district court's grant of a preliminary injunction with great deference, the majority's silence on this matter is troubling.

The applicable standard is summarized as follows.  We must "review[] the grant of a preliminary injunction for an abuse of discretion."  *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).  Under this standard, "[a] district court's findings of fact underlying its decision to grant a preliminary injunction are reviewed for clear error and the legal conclusions underpinning its decision are reviewed de novo." *Id.* (internal quotation marks omitted).  "Because a trial court's decision to grant a preliminary injunction is accorded great deference, this court should disturb such a decision only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (internal quotation marks omitted).

> There are four preliminary injunction factors that a court must consider:
>
> (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

*Id.* "The district court's weighing and balancing of the equities is overruled only in the rarest of cases." *Id.* (internal quotation marks and alteration omitted).  Certain of these factors, however, employ a separate standard of review.  For example, "[t]he district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*." *Certified Restoration Dry*

*Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007).  I will focus my analysis on this factor.

## II.  PREEMPTION ANALYSIS

The NLRA preemption analysis involves two inquiries.  First, a court must consider whether the action at issue is "subject to pre-emption by the NLRA." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 227 (1993).  "It is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." *Wis. Dep't of Indus., Labor, & Human Relations v. Gould, Inc. ("Gould")*, 475 U.S. 282, 286 (1986).  As a general matter, "States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Id.*  As explained in *Boston Harbor*, however, not all actions taken by a state are subject to preemption by the NLRA; in fact, only regulatory actions come under such scrutiny.  507 U.S. at 227. When a state acts in a proprietary manner, for example, the state is not regulating.  *Id.*

If a court determines that the legislation is regulatory, it must then address whether either of the two preemption principles established by the Supreme Court apply: (1) *Garmon* preemption, established in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), or (2) *Machinists* preemption, established in *Lodge 76, International Association of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976).  *Boston Harbor*, 507 U.S. at 224–26.  If the legislation is preempted under either principle, it cannot stand.  Because my disagreement with the majority's analysis is based largely on that which the majority omitted, I will set forth in detail the applicable legal framework before applying it to this appeal.

### A.  The Amended Act is Regulatory

The first inquiry a court must make is whether the state action is subject to preemption by the NLRA—i.e., whether the action is proprietary or regulatory in nature. The Supreme Court has explained that while "the NLRA prevents a State from

regulating within a protected zone, . . . [a] State does not regulate, however, simply by acting within one of these protected areas." *Boston Harbor*, 507 U.S. at 226–27. "When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." *Id.* at 227. The Court further explained, though, that the government is held to a different standard than that of private parties when it comes to distinguishing between regulatory and proprietary conduct, for "[w]hen the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role." *Id.* at 229. "[A]s regulator of private conduct, the State is more powerful than private parties." *Id.*; *see also Gould*, 475 U.S. at 290 ("But government occupies a unique position of power in our society, and its conduct, regardless of form, is rightly subject to special restraints.").

Because of the unique dynamic created when a state acts in the area of labor relations, the Supreme Court has given substantial guidance on the distinction between actions that are proprietary and actions that are regulatory. Specifically, the Supreme Court has identified two factors that should inform a court's analysis on this point—the breadth of the action taken and whether the action reflects a legitimate interest in the efficient procurement of goods and services. The Court has also made clear that it is improper to rely on the way in which the state classifies the action. Instead, a court must focus on what the state action actually does and how it affects the rights protected by the NLRA.

Instead of following this binding Supreme Court precedent—as well as the decisions of the Second, Third, Fifth, Seventh, and Ninth Circuits; two panels of the D.C. Circuit; and a decision of this Court in *Petrey v. City of Toledo*, 246 F.3d 548 (6th Cir. 2001), *abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424 (2002)—the majority has chosen to adopt a standard set forth by a single panel of the D.C. Circuit that directly contradicts Supreme Court precedent. I cannot agree that this is the correct course.

The Supreme Court first acknowledged these guiding principles in *Gould*, where it was faced with determining whether the NLRA preempted a Wisconsin statute that "debarr[ed] certain repeat violators of the [NLRA] from doing business with the State." 475 U.S. at 283. In *Gould*, Wisconsin encouraged the Court to consider the statute as an exercise of its spending power rather than as a regulation of labor relations, and therefore not subject to preemption by the NLRA. *Id.* at 287. The Court declined this invitation, asserting that how a state categorized an action made no difference, as "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." *Id.* at 289 (internal quotation marks omitted). The Court also rejected Wisconsin's argument that it was acting in a proprietary capacity: "by flatly prohibiting state purchases from repeat labor law violators Wisconsin simply is not functioning as a private purchaser of services; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation." *Id.* (internal quotation marks and citation omitted).

Seven years later, the Supreme Court considered the issue again in *Boston Harbor*, a case in which organizations challenged a single labor agreement entered into by the Massachusetts Water Resources Authority ("MWRA"). There, the Supreme Court determined that MWRA was not acting in a regulatory manner when it decided against employing a PLA in a ten-year, $6.1 billion cleanup project. *Boston Harbor*, 507 U.S. at 221, 232. The Court's analysis centered on the fact that "the challenged action in this litigation was specifically tailored to one particular job." *Id.* at 232. As such, the Court reasoned that "[t]here is no question but that MWRA was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* When the state acts "in the role of purchaser of construction services," the Court explained, there is "no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry." *Id.* at 232–33 (internal quotation marks omitted). The Court reiterated its emphasis on the narrow reach of the state's conduct and the efficient procurement of services for that single project, leading it to conclude that the state was acting as a market participant rather than as a regulator.

Finally, the Court recently reiterated these principles in a case where several organizations argued that provisions of a California statute impermissibly regulated employer speech relating to unions. *Chamber of Commerce v. Brown*, 554 U.S. 60 (2008). The Court agreed, stating that "[i]t is beyond dispute that California enacted AB 1889 in its capacity as a regulator rather than a market participant." *Id.* at 70. Importantly, the Court described the *Boston Harbor* standard as follows: "In finding that the state agency had acted as a market participant, we stressed that the challenged action was specifically tailored to one particular job, and aimed to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* (internal quotation marks omitted). Additionally, it emphasized that the stated purpose of a statute does not govern the analysis. To that end, the Court rejected "the neutral statement of policy" set forth in the preamble and instead relied on the substance of the statute and its effects. *Id.* at 63. The Court stated that "[i]n NLRA pre-emption cases, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." *Id.* at 69 (internal quotation marks omitted).

Additionally, the vast majority of our sister circuits to have addressed NLRA preemption have chosen to follow this framework. One of the first circuits to examine this issue in light of the Supreme Court's ruling in *Boston Harbor* was the D.C. Circuit. In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), the D.C. Circuit struck down an executive order "barring the federal government from contracting with employers who hire permanent replacements during a lawful strike." *Id.* at 1324. The D.C. Circuit distinguished this case from *Boston Harbor* on several grounds. First, the D.C. Circuit explained that "[i]t does not seem to us possible to deny that the President's Executive Order seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers." *Id.* at 1337. In fact, the court hypothesized that in *Boston Harbor*, "[s]urely, the result would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law or the Governor had issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements . . .

containing [PLAs]." *Id.* Given the breadth of the policy set forth in this case, the court reasoned, the executive order "cannot be equated to the *ad hoc* contracting decision made by MWRA in seeking to clean up Boston Harbor." *Id.*

Second, the court described the unique role the NLRA plays in situations where a government entity attempts to regulate labor relations: "labor relations policy is different because of the NLRA and its broad field of pre-emption. No state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or its purpose may be." *Id.* Applying that standard to the case at hand, the D.C. Circuit noted that because "the premise of the Executive Order is the proposition that the permanent replacement of strikers unduly prolongs and widens strikes and disrupts the proper 'balance' between employers and employees[,] . . . [w]hatever one's views on the issue, it surely goes to the heart of United States labor relations policy." *Id.*

In 2002, however, the D.C. Circuit employed a different analysis in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), a case examining an executive order "provid[ing] that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a [PLA]." *Id.* at 29. Because the language in the executive order mirrors the language of the amended Act, the majority adopts *Allbaugh*'s logic wholesale. Upon review of the Supreme Court precedent in this area, however, I must agree with the district court's assessment that *Allbaugh* misconstrues critical aspects of *Gould*, *Boston Harbor*, and *Brown* and runs contrary to the great weight of authority on NLRA preemption.

The *Allbaugh* court concluded that the executive order at issue was proprietary in nature, explaining that "[b]ecause the Executive Order does not address the use of PLAs on projects unrelated to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as 'regulatory.'" *Id.* at 36. As pointed out by the district court, however, *Allbaugh* relies heavily on a

proposition from *Boston Harbor* that was taken wholly out of context. Specifically, *Allbaugh* states that "[a] condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].'" *Id.* at 36 (quoting *Boston Harbor*, 507 U.S. 228–29) (alterations in original). In fact, *Boston Harbor* states as follows:

> Respondents quote the following passage from *Gould*, arguing that it stands for the proposition that the State as proprietor is subject to the same pre-emption limitations as the State as regulator[.]
>
> . . .
>
> The above passage does not bear the weight that respondents would have it support. The conduct at issue in *Gould* was a state agency's attempt to compel conformity with the NLRA. Because the statute at issue in *Gould* addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we concluded: Wisconsin simply is not functioning as a private purchaser of services, and therefore, for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation. We emphasized that we were not saying that state purchasing decisions may never be influenced by labor considerations.

*Boston Harbor*, 507 U.S. at 228–29 (internal quotation marks, citations, and alterations omitted).

The discrepancy between these two passages makes clear that it was inaccurate to characterize *Boston Harbor* as holding that the *only* relevant consideration is whether the conduct at issue is unrelated to the performance of contractual obligations. As an initial matter, this passage is not the holding of *Boston Harbor*, rather, it merely acts to rebut the respondent's argument that a state is subject to preemption limitations even when it is acting in a proprietary capacity. Moreover, as shown above, the *Boston Harbor* Court relied on at least two other factors in reaching its decision—the scope of the action and whether it reflected the state's interest in efficiently procuring goods and services. That these factors are the critical import of *Boston Harbor* is further supported

by the fact that the *Brown* Court's description of the *Boston Harbor* standard includes these two factors rather than the factor relied on by the *Allbaugh* court. Whether the conduct at issue is unrelated to the performance of contractual obligations is simply not the only relevant factor at issue. In fact, it is not even a central one.

Another concern that I have with the majority opinion is the fact that it adopted the *Allbaugh* court's statement "that there simply is no logical justification for holding that if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as a market participant." 295 F.3d at 35 (internal quotation marks and alteration omitted). As an initial matter, this statement ignores the detailed descriptions given by the Supreme Court distinguishing regulatory and proprietary conduct. For example, it completely ignores the fact that breadth is one of the two most important considerations to take into account when making this determination.

More importantly, I cannot agree with this assertion because it directly contradicts a principle well established by the Supreme Court: states must abide by different standards than private actors in areas governed by the NLRA. In *Gould*, the Court reminded us that "[w]hat the Commerce Clause would permit States to do in the absence of the NLRA is thus an entirely different question from what States may do with the Act in place." 475 U.S. at 290. The NLRA "treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play." *Id.* For example, while private actors may "regulate" by adopting a broad policy based wholly on principle, "States have a qualitatively different role to play from private parties." *Boston Harbor*, 507 U.S. at 229. When a state acts based on principle, "it performs a role that is characteristically a governmental rather than a private role." *Id.* I thus cannot agree with the majority that there is no distinction between actions taken by a government entity and a private proprietor in this area. Maj. Op. at 8 ("But private proprietors can and do act on an across-the-board basis without somehow

becoming regulators."). That a private proprietor can act in a way tantamount to regulation where a government entity cannot is a fundamental principle upon which the Supreme Court relies time and again. I would reject the *Allbaugh* court's analysis and instead rely on the NLRA preemption principles asserted by the Supreme Court.

Moreover, other courts have examined language virtually identical to that at issue in *Allbaugh* and have reached the opposite result. For example, the Ohio Supreme Court considered a statute with provisions similar to those at issue in *Allbaugh* and concluded that it was regulatory in nature. *Ohio State Bldg. & Constr. Trades Council v. Cuyahoga Cnty. Bd. of Comm'rs*, 781 N.E.2d 951, 953, 970 (Ohio 2002). In its opinion, the court explained that the legislation at issue "is a blanket, across-the-board prohibition that precludes any sort of ad hoc determination as to the benefits or advantages of utilizing a PLA on a particular project. It is therefore '"tantamount to regulation" or policymaking.'" *Id.* at 969–70 (quoting *Boston Harbor*, 507 U.S. at 229).

In reaching this conclusion, the Ohio Supreme Court interpreted *Boston Harbor* to "suggest[] that a state would be acting as a regulator or policymaker, rather than as a purchaser, proprietor, or market participant, were it to impose an across-the-board rule that either requires or prohibits the use of PLAs on all public construction projects." *Id.* at 966. Furthermore, the court expressly rejected the logic of *Allbaugh*, explaining that its "reasoning, we believe, places the proverbial cart before the horse. These courts assume that a state acts as a market participant by doing what a private actor may do under the NLRA." *Id.* at 968–69. "But the gist of *Boston Harbor* is that a state may act as a private contractor would act *when it acts as a market participant*. Otherwise, the state would be permitted to regulate within a protected zone because a private actor may do so." *Id.* at 968–69. I cannot agree with the majority's decision here to ignore these weaknesses of the *Allbaugh* analysis, especially in light of the clear Supreme Court precedent pointing out the problems with undertaking such an analysis.

Finally, it is important to recognize that we have adopted previously a test set forth by the Fifth Circuit in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999). *Petrey v. City of Toledo*, 246 F.3d 548 (6th Cir. 2001),

*abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424 (2002).  In addition to my belief that we should employ this standard because it is correct, I must also note that we must adhere to this standard because it was adopted in a published decision of this court.  The majority's refusal to recognize this fact does not make it any less relevant.

In *Cardinal Towing*, the Fifth Circuit summarized the controlling precedent as follows, which I believe to be accurate:  "The Supreme Court has found that when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulation subject to preemption."  180 F.3d at 691.  "When, however, a state attempts to use its spending power in a manner tantamount to regulation, such behavior is still subject to preemption."  *Id.* (internal quotation marks omitted).  The Fifth Circuit thus developed the following test for discerning whether a state's conduct is proprietary:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Id.* at 693.  Unlike the standard employed in *Allbaugh*, this test incorporates all of the relevant considerations noted in *Boston Harbor* and *Brown*.  Recognizing this fact, the Second and Ninth Circuits have also adopted the Fifth Circuit test.  *See Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1023 (9th Cir. 2010); *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 109 (2d Cir. 2006).

The Third Circuit has similarly created a two-part test that focuses on these principles:  "First, does the challenged funding condition serve to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier?  Second, is the scope of the funding condition 'specifically tailored' to the proprietary interest?"  *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 216 (3d Cir. 2004).  The Third Circuit reached this standard

after engaging in a detailed analysis of the difference between regulatory and proprietary conduct, explaining that "[t]he pivotal difference [between *Gould* and *Boston Harbor*] is that in the former case the state deployed its spending authority to achieve a goal far broader than merely protecting or fostering its own investment or proprietary interest, while in the latter instance the public agency limited its spending conditions to the protection of its investment or proprietary interest." *Id.* at 214.  Notably, the Third Circuit's standard references only a "proprietary interest in *a* project or transaction." *Id.* at 216 (emphasis added).  By its own terms, then, it would not define as proprietary an action affecting all projects controlled by any governmental unit.

Additionally, although it did not adopt a two-part test, the Seventh Circuit has articulated a standard similar to that of the Second, Third, Fifth, and Ninth Circuits—one that focuses on the scope of the action.  *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004 (7th Cir. 2005).  In *Lavin*, the Seventh Circuit held that "[b]ecause Illinois has limited its condition to the project financed by the subsidy, it has not engaged in 'regulation' under the approach of *Boston Harbor* or *Gould*, and its conditions are not preempted by federal labor law." *Id.* at 1007; *see also Colfax Corp. v. Ill. State Toll Highway Auth.*, 79 F.3d 631, 634 (7th Cir. 1996) (concluding that the state action at issue was proprietary because the state had not enacted a statute or passed a general rule).

Also significant is *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003).  When given the opportunity to address this issue for a third time, the D.C. Circuit opted to revert to the principles it asserted in *Reich*.  Reviewing an executive order that applied "to all government contracts involving more than $100,000," the court stated that "[a] clause is likely to be found regulatory where it apparently seeks to set a broad policy." *Id.* at 362–63 (internal quotation marks omitted).  Citing *Reich*, the court concluded that the action was regulatory:  "But as the order operates on government procurement across the board, rather than being tailored to any particular setting, the order is regulatory under prevailing principles." *Id.*

With the exception of *Allbaugh*, then, courts that have addressed this issue post-*Gould* and *Boston Harbor*, including the Supreme Court, focus on whether the challenged action reflects an interest in efficiently procuring these goods and services and on the scope of that action. Against this backdrop, I believe that we should continue to employ the Fifth Circuit test—considering whether "the challenged action essentially reflect[s] the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances" and whether "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *Cardinal Towing*, 180 F.3d at 693. I also believe that this standard requires us to construe the amended Act as regulatory.

First, the breadth of the amended Act is undoubtedly expansive. By its own terms, it applies to all governmental units, which Michigan has defined as "this state, a county, city, township, village, school district, intermediate school district, community college, or public university that receives appropriations from this state, or any agency, board, commission, authority, or instrumentality of the foregoing." MICH. COMP. LAWS § 408.873. Additionally, the amended Act applies without regard to the source of the project's funding. In other words, even a school district that is overseeing a privately funded project is forbidden from entering into a PLA on that project. Moreover, because PLAs necessarily include every contractor and subcontractor working on the project, all organizations that would ordinarily seek to enter into a PLA with any of these governmental units are affected, as the amended Act makes it impossible for them to enter into a PLA with these governmental units.

The only way in which the majority even attempts to reconcile the breadth of these provisions with its conclusion that the amended Act is sufficiently narrow to be considered proprietary is by pointing out actions that the amended Act does not regulate—in particular, PLAs entered into between private parties. But this approach evades the critical issue we must resolve in two key respects. First, it misstates the right at issue in this appeal. Contrary to the majority's assertions otherwise, the right at issue

is not an organization's ability to enter into a PLA generally. Rather, it is the right to attempt to convince a governmental entity to enter into a PLA, an action that is wholly precluded by the plain terms of the amended Act. The significance of the majority's misguided analysis on this point cannot be overstated. Imperative to assessing whether a statute regulates a right is recognizing correctly the right at issue. Relatedly, when the right at issue is wholly precluded by the action at issue, it is hard to understand how the action can be construed as narrow with respect to its effect on the right.

Second, in assessing the breadth of an act, it is critical to consider what that act actually does. Instead of taking this approach, however, the majority chooses to articulate only that which the amended Act does not do. This cannot be a persuasive approach. If it were, then every state action could be construed as narrow, as no statute exists that covers all actions taken by every actor. An analysis of that which the amended Act does not cover should not supplant an analysis of that which the amended Act does cover.

It is also important to note that with the exception of *Allbaugh*, the amended Act is dissimilar from those actions that have been upheld in previous cases, as it constitutes an across-the-board policy with no temporal or project-based limits. For example, in *Boston Harbor*, the Supreme Court upheld the state action because it "was specifically tailored to one particular job," a point that it later reiterated in *Brown*. *Boston Harbor*, 507 U.S. at 232. Likewise, in *Lavin*, the Seventh Circuit found a state action proprietary where it "limited its condition to the project financed by the subsidy." 431 F.3d at 1007; *see also Sage Hospitality Res.*, 390 F.3d at 217–18 (upholding a requirement where it was "limited to hotels and hospitality projects receiving TIF funds"). Here, the amended Act affects all projects developed by every governmental unit in the state. It has no provision limiting its applicability to a geographic region or type of project, let alone one that would restrict it to a single project. In *Rancho Santiago*, the Ninth Circuit similarly focused on the scope of the action when it upheld a PLA on the basis that it was limited to a three-to-five-year period for all projects carried out in a college district. 623 F.3d at 1028–29. Here, there is no such temporal limitation.

Furthermore, the actions that have been struck down by courts are strikingly similar to the amended Act. For example, in *Reich* the D.C. Circuit struck down an executive order on the basis that it was not limited to an "*ad hoc* contracting decision" as was the case in *Boston Harbor*. 74 F.3d at 1337. Rather, the court explained, it was clear that the executive order "seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers." *Id.* The Ohio Supreme Court also struck down a statute based on its breadth, as the statute was "a blanket, across-the-board prohibition that precludes any sort of ad hoc determination as to the benefits or advantages of utilizing a PLA on a particular project." *Ohio State Bldg. & Constr. Trades Council*, 781 N.E.2d at 969–70. Here, the amended Act similarly precludes all governmental units from making any ad hoc determinations relating to the benefits of using a PLA on a particular project. In sum, the amended Act is most similar to those governmental actions that have been struck down by courts and is dissimilar from those that courts have upheld.

With respect to the efficient-procurement factor, I am most concerned by the majority's assertion that because "the government unquestionably is the proprietor of its own funds, . . . when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity." Maj. Op. at 11–12 (internal quotation marks omitted). This cannot be true. If it were, then two critical principles articulated by the Supreme Court would effectively be rendered null: (1) the express instruction to consider the breadth of the action as a factor in this analysis and (2) the tenet that broad actions taken by a state actor are tantamount to regulation even where a private actor would be allowed to act. As articulated in greater detail above, in areas governed by the NLRA the Supreme Court has made clear that while private actors may "regulate" by adopting a policy based wholly on principle, "States have a qualitatively different role to play from private parties." *Boston Harbor*, 507 U.S. at 229. The majority, however, does not even mention this limitation.

Furthermore, I cannot agree with the majority's conclusion that the statute reflects a mere interest in efficient procurement of goods and services rather than an

attempt to affect labor policy.  Notably, the only sources the majority cites in support of this contention are those that the Supreme Court has expressly discouraged, including the amended Act's statement of intent, its legislative history, and whether it is ultimately effective.  As explained above, however, the Supreme Court has instructed us to focus on what the state action does as opposed to how it is described.  And here, the state action at issue forecloses all governmental units from entering into a specific kind of collective bargaining agreement.  This is not a neutral action based in efficiency.  It is an attempt to affect labor policy.

Likewise, the majority is incorrect to cite the effectiveness of the amended Act as a reason supporting its determination that it is proprietary.  *See, e.g.*, *Rancho Santiago*, 623 F.3d at 1025 ("[W]hether the [action's] benefits outweighed its costs . . . bears only on whether the [entity] made a good business decision.").  The majority offers no authority to the contrary explaining why these sources should be considered.  To the extent the majority relies on these sources, its analysis should be discounted.  I would therefore agree with the district court that the amended act does not reflect an interest in the efficient procurement of goods and services.

## B.  *Garmon* and *Machinists* Preemption

Because I would hold that amended Act was regulatory rather than proprietary, I will briefly address whether it is preempted by the NLRA.  "Although the NLRA itself contains no express pre-emption provision, [the Supreme Court has] held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy."  *Brown*, 554 U.S. at 65.  "The first, known as *Garmon* pre-emption, is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA."  *Id.* (internal quotation marks and citation omitted).  "To this end, *Garmon* pre-emption forbids States to regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits."  *Id.* (internal quotation marks omitted).  "The second, known as *Machinists* pre-emption, forbids . . . States to regulate conduct that Congress intended be unregulated."  *Id.* (internal quotation marks omitted).  "*Machinists*

pre-emption is based on the premise that Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Id.* (internal quotation marks omitted).

The first step in these preemption analyses is to determine whether the district court was correct in concluding that the NLRA protects a trade association's right to attempt to convince a public entity to enter into a PLA and that the amended Act interferes with this right. Snyder argues that the district court's conclusion that this right is protected was unsupported by any legal authority. The district court's conclusion that the right to convince the state to enter into a PLA is a concerted activity protected under Section 7 of the NLRA, however, is supported by the text of Sections 7 and 8 of the NLRA, as well as Supreme Court precedent.

Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Supreme Court has recognized that this is a broad provision, explaining that "labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). With respect to Section 8, the Supreme Court has established two significant principles. First, it asserted that "Section 8(f) explicitly permits employers in the construction industry—but no other employers—to enter into prehire agreements [(PLAs)]." *Boston Harbor*, 507 U.S. at 230. Second, the Court explained that "[p]rehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees." *Id.*

In light of this authority, Snyder's argument that an employee's right to convince the state to enter into a PLA, a type of agreement authorized by Section 8(f) and deemed a collective bargaining agreement by the Supreme Court, is not protected under the Section 7 right "to bargain collectively through representatives of their own choosing,

and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" is unpersuasive. 29 U.S.C. § 157. Moreover, it seems evident that a statute forbidding a governmental unit from entering into a PLA interferes with the right to convince the state to enter into a PLA. The majority's attempt to dodge this issue by focusing on the fact that contractors can enter into a PLA with one another is unpersuasive, as it says nothing about the right to convince the state to enter into a PLA. I would thus hold that the district court was correct to recognize this as a right protected by the NLRA and as one with which the amended Act interferes.

Upon determining that the right is protected and that the state action interferes with the right, the next step is to apply the *Garmon* and *Machinists* doctrines. The district court concluded that both *Garmon* and *Machinists* preemption apply to the Acts. Because the right to attempt to convince governmental units to enter into a PLA is protected under Section 7 of the NLRA, there seems to be no doubt that *Garmon* preemption would apply, as *Garmon* preemption prohibits state or local regulation of activities protected under Section 7 of the NLRA. *Garmon*, 359 U.S. at 244.

Likewise, *Machinists* preemption, which prohibits state and local regulation of areas meant to be left unregulated, applies to the amended Act. Under this doctrine, however, the focus is whether the state regulation upsets the balance of power between management and employees that Congress established in the NLRA. *Boston Harbor*, 507 U.S. at 226. At issue here, then, is Section 8 of the NLRA—specifically, whether the amended Act upsets the balance Congress created by expressly allowing for PLAs in the construction industry. It seems obvious that a regulation prohibiting a type of collective bargaining agreement that the NLRA allows would upset the balance of power established by Congress in the NLRA. I would agree with the district court's conclusion that the trade councils are likely to succeed on the merits of their claims under both *Garmon* and *Machinists* preemption.

### III. CONCLUSION

For the reasons stated, I would affirm the district court's preliminary injunction against the enforcement of the amended Act.  I respectfully dissent.